# United States Court of Appeals
## For the First Circuit

No. 16-1348

PACKGEN,

Plaintiff, Appellee,

v.

BERRY PLASTICS CORPORATION;
COVALENCE SPECIALTY COATINGS, LLC,

Defendants, Appellants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. Nancy Torresen, U.S. District Judge]

Before

Torruella, Lynch, and Lipez,
Circuit Judges.

Jonathan M. Dunitz, with whom Taylor R. Neff and Verrill Dana
LLP were on brief, for appellants.
    Kurt E. Olafsen, with whom Olafsen & Butterfield LLC was on
brief, for appellee.

February 1, 2017

**TORRUELLA**, **Circuit Judge**. Defendants-Appellants Berry Plastics Corporation and Covalence Specialty Coatings, LLC (collectively, "Berry") appeal from a jury's award of $7.2 million in damages to Plaintiff-Appellee Packgen resulting from the failure of material Berry had supplied to Packgen. Berry contends that the district court erred by (1) denying Berry's motion to exclude Packgen's damages expert, (2) allowing Packgen employees to testify concerning potential Packgen customers' intent to purchase Packgen's new product, and (3) failing to correct these errors by denying Berry's motion for judgment as a matter of law, a new trial, or to alter or amend the judgment. We affirm.

## I. BACKGROUND

### A. Factual Background

Packgen manufactures a polypropylene intermediate bulk container used to transport and store catalyst, a hazardous and volatile chemical agent used to refine crude oil. No other company manufactures similar polypropylene containers, but refineries also lease metal flow bins to transport and store catalyst. In the mid-2000s, Packgen redesigned its bulk containers. It made the redesigned container, called the Cougar, out of a laminated fabric. Berry supplied the laminated fabric and represented that it could meet Packgen's quality standards.

As part of the redesign, Packgen worked with CRI/Criterion ("CRI"), a catalyst manufacturer and its largest customer at the time, to modify the new Cougar to meet CRI's specialized requirements. After a lengthy process, CRI began purchasing Cougars in October of 2007. From October 2007 to March 2008, CRI purchased 7,567 Cougars for nearly $1.5 million, and it placed an order for 1,359 Cougars to be delivered in April 2008.

Packgen also began marketing the Cougar to North American refineries in 2007, focusing on thirty-seven refineries where CRI supplied catalyst containers. Those refineries were likely customers because they would experience the Cougars CRI used, and they were all long distances from their catalyst suppliers, so they would save significant transport costs using the lighter, more compact Cougar rather than flow bins. Packgen's sales manager testified that decision-makers at all thirty-seven refineries had told her "that they were going to be purchasing the [C]ougars on their next turnaround cycle." Decision-makers at ten of the refineries had also told Packgen's president that they "were willing to purchase and try [Packgen's] containers."

On April 4, 2008, one of the Cougars CRI had purchased split open while being moved. Over the next weeks, Packgen learned that other Cougars had also failed, in some cases causing the catalyst inside to combust, and it began to investigate. Packgen

-3-

determined that the Cougar had failed because some of the laminated fabric supplied by Berry was faulty, and that it had sold CRI approximately two thousand Cougars made from the faulty laminated fabric. Following the incident, CRI cancelled its order of 1,359 Cougars for the month of April, and it never ordered another Cougar. In addition, the thirty-seven refineries did not order Cougars as Packgen had anticipated.

## B. Procedural History

Packgen filed suit against Berry in Maine Superior Court, alleging breach of contract, breach of implied and express warranties, and negligence. Berry removed the case to the United States District Court for the District of Maine.

Packgen designated Mark G. Filler, a certified public accountant and certified valuation analyst, as an expert witness on damages. Berry moved to exclude Filler's opinions and testimony under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), and the district court held a two-day Daubert hearing. On September 12, 2014, the district court issued a forty-seven-page order denying Berry's motion to exclude. It concluded that a variety of facts supported Filler's ten-year projections of Packgen's lost profits from CRI and the thirty-seven refineries, his assumption that Packgen had a one-in-ten chance each year of selling Cougars to each of the thirty-seven refineries, and his

-4-

assumption that the refineries did not buy Cougars only because of the product failure, and it determined that Filler did not improperly combine forecasting methodologies from both business valuation and lost profits models.

Prior to trial, Berry filed a motion in limine seeking to exclude testimony by Packgen employees concerning CRI's and the thirty-seven refineries' intent to purchase Cougars and why they decided not to make those purchases. The district court reserved ruling on the motion for trial. At trial, the district court ruled that Packgen's president could "testify as to what a decision-maker at CRI told him about what CRI's intent [to purchase Cougars] was" but not "why [CRI was] ceasing business." The district court applied its ruling to subsequent testimony, allowing Packgen's president and sales manager to testify that decision-makers at the thirty-seven refineries had expressed their intent to purchase Cougars but not about why those thirty-seven refineries subsequently did not make purchases.

After a trial, on November 12, 2015, the jury returned a verdict against Berry and awarded $7,206,646.30 in damages to Packgen. On January 29, 2016, the district court denied Berry's motion for judgment as a matter of law, for a new trial, or to

-5-

alter or amend the judgment.[1]  The district court entered judgment against Berry on March 8, 2016, and Berry timely appealed.

## II.  ANALYSIS

Berry argues on appeal that the district court abused its discretion by admitting Filler's testimony regarding Packgen's lost profits from the refineries because (1) he did not establish that the Cougar failures caused Packgen any lost profits from the refineries, (2) no facts supported his ten-year loss period, and (3) no facts supported his one-to-ten odds of selling Cougars to the refineries.  Berry further argues that the district court abused its discretion by admitting Filler's testimony regarding damages attributable to lost business from CRI because (1) no facts supported his assumption that CRI would purchase 1,261 units per month, (2) no facts supported his ten-year loss period, and (3) his analysis improperly combined lost-profit and business-valuation methodologies.  In addition, Berry asserts that the district court erred by allowing Packgen's employees to testify about CRI's and the refineries' stated intent to purchase Cougars, because their testimony relied on hearsay, and that it erred by denying Berry's motion for judgment as a matter of law, for a new

---

[1]  The trial judge was not the same as the judge who held the Daubert hearing.

-6-

trial, or to alter or amend the judgment. We address these arguments in turn.

## A. The District Court Did Not Abuse Its Discretion by Admitting Filler's Testimony

A district court must "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." Daubert, 509 U.S. at 597. To determine whether testimony is sufficiently reliable -- Berry does not challenge the testimony's relevance -- a district court must determine whether it is "based on sufficient facts or data," was "the product of reliable principles and methods," and whether the expert "reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. "Exactly what is involved in 'reliability' . . . must be tied to the facts of a particular case." Milward v. Acuity Specialty Prods. Grp., Inc., 639 F.3d 11, 14-15 (1st Cir. 2011) (quoting Beaudette v. Louisville Ladder, Inc., 462 F.3d 22, 25-26 (1st Cir. 2006)). "So long as an expert's scientific testimony rests upon good grounds, based on what is known, it should be tested by the adversarial process, rather than excluded for fear that jurors will not be able to handle the scientific complexities." Id. at 15 (quotation marks and citation omitted) (quoting Daubert, 509 U.S. at 590).

We review a district court's decision to admit an expert's testimony for abuse of discretion, unless the district

court "altogether abdicate[d] its role under Daubert."  Smith v. Jenkins, 732 F.3d 51, 64 (1st Cir. 2013).  There is no plausible argument that the district court abdicated its role here, no matter how many times Berry's briefs repeat the word "abdicate" or a variant.[2]  The district court held a two-day Daubert hearing and issued a forty-seven page opinion addressing Berry's arguments and explaining the reasons Filler's testimony had sufficient support. Our review is only for abuse of discretion.

## 1. Filler's Testimony Concerning the Thirty-Seven Refineries

Filler testified that he used simulation software to calculate Packgen's likely lost profits from sales of Cougars to the thirty-seven refineries over a ten-year period beginning in April 2008 and ending in April 2018.  Filler's model assumed that each year "Packgen had a one in ten chance of selling Cougars" to each refinery.  Once a refinery began buying Cougars, "Packgen w[ould] continue to sell Cougars to [that] refinery" until the end of the ten-year period.  If Packgen had not yet sold to a particular refinery, the model assumed Packgen would "try one more time."  The model also subtracted "actual mitigating sales to these refineries" in the first four years of the ten-year period (which were known) and "expected mitigating sales" for the

---

[2]  Nineteen.

remaining six years.  This yielded net lost profits of $1,909,073:

the difference between Packgen's likely net profits if the material

that Berry supplied had not been defective, and its likely net

profits after the Cougars failed.[3]

### a. There Was Sufficient Evidence of Causation to Support Filler's Testimony

Berry first argues that Filler should have conducted a

market survey to determine which refineries would actually have

purchased Cougars, rather than "assuming" that the thirty-seven

refineries would have purchased Cougars.  Berry also asserts that

Filler was required to account for other reasons Cougars failed

(i.e., improper exposure to "freezing and thawing," mishandling,

and punctures from a forklift).  There was adequate evidence,

however, that the thirty-seven refineries would purchase Cougars,

including testimony that those refineries would see substantial

savings by using the Cougars, that the refineries' decision-makers

had expressed an intent to purchase Cougars, and that those

refineries would see CRI using the Cougars and be persuaded to try

them.

---

[3] Filler submitted his expert report in 2012, but his loss period ran through 2018.  In estimating Packgen's sales following the Cougar failures, he therefore used four years of actual sales data and projected the remaining six years.

Moreover, Filler was not required to do a market survey, as Berry suggests. The existence of other methods of gathering facts does not mean that the facts he relied on were insufficient. See Fed. R. Evid. 702 advisory committee's note to 2000 amendment ("The amendment is broad enough to permit testimony that is the product of competing principles or methods . . . ."). Filler "based his calculations on facts meeting the[] minimum standards of relevance and reliability." i4i Ltd. P'ship v. Microsoft Corp., 598 F.3d 831, 856 (Fed. Cir. 2010) (citing Fed. R. Evid. 702). His testimony alone "did not have to establish the validity of [a] central, disputed factual claim[]" -- that the defective Cougars caused the thirty-seven refineries to avoid buying Cougars -- "to have a factual basis and be admissible." Int'l Adhesive Coating Co. v. Bolton Emerson Int'l, Inc., 851 F.2d 540, 545 (1st Cir. 1988). Berry was free to argue to the jury that Filler's failure to conduct a survey made his opinion less persuasive,[4] but that failure did not make his opinion inadmissible.

Similarly, the fact that a few Cougars failed for reasons in addition to Berry's defective product does not make Filler's testimony unreliable. An expert should "adequately account[] for

---

[4] Berry did question Filler's basis for assuming that Berry's defective material caused refineries not to purchase Cougars, but it chose not to conduct a market survey of its own and use the results to impeach Filler's testimony.

obvious alternative explanations." Fed. R. Evid. 702 advisory committee's note to 2000 amendments (citing Claar v. Burlington N.R.R., 29 F.3d 499 (9th Cir. 1994)). Filler did that here, finding that "there w[ere] no social, environment[al], [or] legal reasons why all of a sudden [CRI[5]] would stop buying [Cougars]," and that the competitive market had not changed. The minor incidents of Cougar failures that Berry cites are very different in both type and impact from shipping two thousand defectively-manufactured Cougars, and Filler was not required to eliminate every other possible cause. Ambrosini v. Labarraque, 101 F.3d 129, 140 (D.C. Cir. 1996) ("The fact that several possible causes might remain 'uneliminated' . . . only goes to the accuracy of the conclusion, not the soundness of the methodology."); see also Currier v. United Techs. Corp., 393 F.3d 246, 252 (1st Cir. 2004) (holding that damages expert's "fail[ure] to take into account" differences in situations between various employees was "a matter of weight rather than admissibility"); Cummings v. Standard Register Co., 265 F.3d 56, 65 (1st Cir. 2001) (affirming admission of damages expert's testimony because, although "using [other] variables would have resulted in a lower, and perhaps more

---

[5] Although Filler specifically mentioned only CRI, the question was not specific to CRI, and the potential causes Filler considered are equally applicable to the refineries.

accurate, figure . . . whatever shortcomings existed in [the expert's] calculations went to the weight, not the admissibility, of the testimony").

> **b. Sufficient Facts Supported Filler's Ten-Year Loss Period**

Filler's model calculated losses for a ten-year period. Berry contends that the "only support" for this period "is a conversation [Filler] had with" Packgen's president. Filler did discuss a ten-year period with Packgen's president, determining that it would take five years for the negative effects of the Cougar failures to "wear off" and another five years for sales to recover fully to where they would have been absent the failures. Those discussions do provide some support for Filler's opinion. See E. Mountain Platform Tennis, Inc. v. Sherwin-Williams Co., Inc., 40 F.3d 492, 503 (1st Cir. 1994) (holding that testimony from plaintiff's employees that "it would take . . . three years to rebuild the business" supported an award of future lost profits).

Filler's ten-year period was also supported by other facts. Filler considered the opinion of Packgen's catalyst expert that Cougars would save the thirty-seven refineries substantial costs, Packgen had "an excellent market presence," and catalyst use would increase until the end of the ten-year period. In addition, Packgen was the only supplier of intermediate bulk

containers, and there were few other options for the refineries, suggesting that few if any other competitors would enter the market.

Importantly, Filler was not projecting market conditions for a full ten years. His loss period began when the Cougars failed in 2008, but the Daubert hearing took place six years later. In those six years, no major new competitors entered the catalyst container market, and Cougar sales to the refineries had begun to recover and "exceed[ed]" Filler's original projections. Actual profits remained lower than the profits Filler projected if Berry's material had not failed, however. Accordingly, it was reasonable to assume that Packgen's lost profits would continue into the future, perhaps at least four more years.

Taken as a whole, the evidence was more than sufficient to support Filler's ten-year loss period.

### c. Sufficient Facts Supported Filler's Assumption That One Refinery in Ten Would Begin Buying Cougars Each Year

Filler's model included an assumption that each year ten percent of the refineries not yet purchasing Cougars would begin to do so. Berry characterizes Filler's one-in-ten odds as "untethered to any facts or data" and again asserts that Filler should have conducted a market survey.

Filler relied on multiple facts in reaching his conclusion, including that the thirty-seven refineries would see CRI using Cougars, that Cougars could provide substantial cost savings to the refineries, and the refineries' expressed interest in Cougars. Filler also discussed the likely success rate with Packgen personnel, who thought Packgen's success rate with the refineries would be "[a] lot higher than ten percent." Filler did not agree with Packgen's estimates, however, because Packgen's personnel "had no evidence" to support their estimates, and Filler understood that there was a lot of "inertia" in the refinery market.

There are certainly sufficient facts to support an inference that Packgen would make some sales to the thirty-seven refineries. The issue is whether those facts provided the minimal basis necessary to support Filler's assumption that one in ten refineries would begin purchasing Cougars each year and allow him to present his calculations to the jury. In allowing Filler to testify, the district court pointed to those facts and recognized that Filler had rejected Packgen's much higher estimated success rate. The district court also rejected Berry's suggestion that Filler was required to conduct a market survey, finding that Berry could argue to the jury that Filler's reliance on Packgen's list of thirty-seven refineries made his opinion unpersuasive.

-14-

The district court did not abuse its discretion in doing so. An expert's methodology must be "consistent with standards of the expert's profession." SMS Sys. Maint. Servs. v. Digital Equip. Corp., 188 F.3d 11, 25 (1st Cir. 1999). Experts may, however, make reasonable assumptions that are consistent with the evidence available to them. See Cummings, 265 F.3d at 65 (affirming the district court's decision to allow a damages expert to testify where the expert's assumptions were those made by similar experts "with some frequency").

That is what Filler did. When pressed on cross-examination, Filler admitted that "[t]here is no empirical data" on what percentage of the thirty-seven refineries would purchase Cougars. The one-in-ten odds, however, produced "results that [Filler] thought were reasonable" because the 13,000 units sold in year ten were comparable to Packgen's sales to CRI -- an existing customer before the Cougars began to fail[6] -- and produced a fifty-percent market penetration by year ten.

_____

[6] Berry characterizes Filler's testimony that his results "were reasonable" as "circular reasoning." It is not. As Filler's testimony shows, his model was reasonable because it produced volumes that were "comparable to what [Packgen was] currently selling [to CRI]." Filler "compar[ed] the unknown to an analogous known experience," a proper methodology. Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc., 738 F.3d 960, 970 (9th Cir. 2013) (holding that criticisms of an expert's choice of comparator company and extrapolation from one market to a larger region went to "the weight of the testimony . . . not its admissibility").

Packgen points to facts suggesting that Filler's assumptions were, in fact, conservative; Packgen's regional sales manager testified that, based on her discussions with the thirty-seven refineries, she expected eighty-five to ninety percent of them to order Cougars. In addition, Packgen's personnel told Filler that they expected a sales rate that was "[a] lot higher" than the ten-percent rate he used. Berry is really challenging Filler's choice of a sales rate, and the district court did not abuse its discretion in determining that that is an argument properly made to the jury.

Berry's other arguments concerning the refineries are not persuasive.

## 2. Filler's Testimony Concerning CRI

Filler used a "deterministic model" -- which does not account for future contingencies -- to calculate Packgen's damages attributable to business lost from CRI. He assumed that what Packgen was "selling [to CRI] in the six-month period" prior to the Cougar failures "would have continued." This represented the period in which CRI purchased the newly-customized Cougars. The average monthly sales for that period were 1,261 Cougars per month, and Filler projected that average out for ten years.

Berry argues that the district court abused its discretion by admitting Filler's opinion because (1) there was no

factual support for the ten-year loss period Filler used, (2) he had "no objective evidence that CRI would continue to purchase" Cougars at the same rate it had in the first six months, and (3) Filler combined lost-profit and business-valuation methodologies, creating "an untested, non-peer reviewed model."

Berry's argument about the ten-year loss period with respect to CRI fails for the same reasons described above with respect to the refineries. There was sufficient evidence that the market was unlikely to change over ten years, and it did not, in fact, change in the six years following the accident and prior to the Daubert hearing.

There was also sufficient evidence to support Filler's assumption that CRI would continue to purchase Cougars in at least the same quantities as it had in the six months prior to the Cougar failures. CRI had dedicated considerable effort to customizing the Cougars for its needs, indicating that it found them useful and was likely to continue to purchase them. In addition, Filler relied on substantial evidence that the market for catalyst containers was unlikely to change dramatically and that there were no other suppliers of intermediate bulk containers. "It is . . . common practice to estimate lost future profits by examining profits earned in the comparable past." Atlas Truck Leasing, Inc. v. First NH Banks, Inc., 808 F.2d 902, 904 (1st Cir. 1987). That

is precisely what Filler did here. Additional data would have been helpful, but Berry was able to make that argument to the jury. Berry's contention that Filler should have considered sales "dating back to 2003" is misplaced. Sales prior to the six-month period were of a different product that had not been specifically tailored to CRI's needs, and so did not represent "the comparable past." Id.

Berry's assertion that Filler improperly "comingl[ed]" lost-profit and business-valuation methodologies also fails. Berry relies entirely on Filler's testimony comparing a lost profits calculation to the "valu[ation] of a business that was destroyed" using "an income approach." Berry nowhere ties this to Filler's actual calculations, however, to explain how they were flawed or inappropriate. Filler explained in great detail how he calculated Packgen's lost profits using its likely sales to CRI, prices, production and capital costs, and other expenses. That testimony, and the exhibits to Filler's report, make clear that he calculated lost profits for the ten-year period, and his references to business valuations were merely an explanatory analogy that did not affect the admissibility of Filler's opinions.

We find no error in the admission of Filler's testimony concerning CRI.

**B.    The District Court Did Not Abuse Its Discretion by Admitting Testimony Concerning the Refineries' Intent to Purchase Cougars**

The district court allowed Packgen's president and its sales manager to testify that decision-makers at the thirty-seven refineries had told them, prior to the Cougar failures, that they would purchase Cougars the next time they needed catalyst containers,[7] over Berry's objection.    The district court determined that the statements, although hearsay, were admissible as the refineries' then-existing state of mind under Fed. R. Evid. 803(3).

"We review rulings admitting or excluding evidence for abuse of discretion."  Shervin v. Partners Healthcare Sys., Inc., 804 F.3d 23, 41 (1st Cir. 2015).  Rule 803(3) allows the admission of any "statement of the declarant's then-existing state of mind (such as motive, intent, or plan)."  "To be admissible under this exception, a declaration, among other things, must mirror a state of mind, which, in light of all the circumstances, including proximity in time, is reasonably likely to have been the same condition existing at the material time."  Colasanto v. Life Ins. Co. of N. Am., 100 F.3d 203, 212 (1st Cir. 1996) (internal

---

[7]  Refineries change out their catalyst at regular intervals.  It is primarily during these change-overs that they use containers such as the Cougar.

quotation marks omitted). "Because disputes over whether particular statements come within a state-of-mind exception are fact sensitive, 'the trial court is in the best position to resolve them.'" United States v. Rivera-Hernández, 497 F.3d 71, 81 (1st Cir. 2007) (quoting Colasanto, 100 F.3d at 212).

Out-of-court statements by a customer or employee may be admissible under Rule 803(3) to show intent or motive. See Catalan v. GMAC Mortg. Corp., 629 F.3d 676, 694-95 (7th Cir. 2011); Callahan v. A.E.V., Inc., 182 F.3d 237, 252 (3d Cir. 1999) (upholding the admission of employees' testimony that customers "told them that they no longer shopped at the plaintiffs' stores because of the [defendant's] operations"). In Catalan, a plaintiff testified that a loan officer "told her that the plaintiffs' home-equity loan applications would not be approved until their foreclosure was removed." 629 F.3d at 694. Rule 803(3) applied because "the loan officer was speaking during the employment relationship concerning matters within the scope of her employment," and so her statement "describ[ed] the bank's collective intentions." Id. at 694-95. Here, each statement by a refinery's decision-maker reflected that refinery's "collective intention" to purchase Cougars the next time the refinery needed catalyst containers.

Although Packgen's president and sales manager both attributed the refineries' statements of intent to decision-makers, Berry contends that "[t]his is not sufficient" because the decision-makers were not specifically named.[8] But the cases Berry cites do not compel that conclusion. Allen v. Sybase, Inc. is inapposite because there, the testimony was impermissibly offered to prove the witness's state of mind, rather than the declarants'. 468 F.3d 642, 660 n.14 (10th Cir. 2006). The testimony in Smith Fiberglass Prods., Inc. v. Ameron, Inc. was excluded because the declarant was identified only as "a gentleman" who stopped by a tradeshow booth, without describing who he was, where he worked, or whether he had decision-making authority for a potential customer. 7 F.3d 1327, 1330-31 & n.2 (7th Cir. 1993). Here, Packgen's witnesses knew the declarants and testified that all declarants were decision-makers at their respective refineries.

Berry also maintains that there was an insufficient "temporal connection between the 37 refineries' intent to purchase and their conversations with" Packgen's president and sales

_____

[8] Berry also takes issue with the admission of "the out-of-court statements of an unnamed person at one refinery to prove the states of mind of all other refineries." (emphasis omitted). Packgen's president only testified as to ten refineries, but Packgen's sales managers testified that all thirty-seven refineries told her "they were going to order the [C]ougars." Thus, there was evidence as to all refineries, and the jury was not required to "extrapolate from these ten refineries to all 37," as Berry asserts.

-21-

manager because the refineries intended to purchase Cougars during their "next cycle," and refineries' catalyst cycles could vary from six months to two years. As Berry's own cases explain, however, Rule 803(3) requires "contemporaneity between the event that gives rise to the state of mind or intention and the declarant's expression of that state of mind or intention." Amerisource Corp. v. RxUSA Int'l Inc., No. 02-CV-2514 (JMA), 2009 WL 235648, at *2 (E.D.N.Y. Jan. 30, 2009); Metro. Enter. Corp. v. United Techs. Int'l Inc., No. 3:03-cv-01685-JBA, 2006 WL 798870, at *1 (D. Conn. Feb. 28, 2006) ("[A] statement . . . must be contemporaneous with the mental state [and] it must be timely such that the declarant had no time to fabricate."). Here, Berry argues only that the refineries' expected purchase date was not contemporaneous to the statements, not their state of mind. That the refineries would actually purchase at a later date, however, does not mean that their statements of intent were not contemporaneous with their mental state.

The district court therefore did not abuse its discretion in admitting the hearsay testimony under Rule 803(3).

## C. Berry's Post-Judgment Motion

Berry's arguments in support of its post-judgment motion for judgment as a matter of law, a new trial, or to alter or amend the judgment rely entirely on its claims that the district court

-22-

should have excluded Filler's testimony and the hearsay testimony concerning the thirty-seven refineries. Because the district court did not abuse its discretion in admitting that testimony, and the evidence at trial was the same as that at the <u>Daubert</u> hearing, it did not err by denying Berry's post-judgment motion.

### III.  <u>CONCLUSION</u>

For the foregoing reasons, we affirm district court's judgment.

**<u>Affirmed</u>.**