In the

# United States Court of Appeals

## For the Seventh Circuit

No. 17-1815

BERRY PLASTICS CORPORATION, n/k/a
Berry Global, Inc.,

*Plaintiff-Appellant,*

*v.*

ILLINOIS NATIONAL INSURANCE
COMPANY,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Southern District of Indiana, Evansville Division.
No. 3:15-cv-00170-RLY-MPB — **Richard L. Young**, *Judge.*

ARGUED JANUARY 9, 2018 — DECIDED SEPTEMBER 10, 2018

Before FLAUM, KANNE, and ROVNER, *Circuit Judges*.

ROVNER, *Circuit Judge.* Berry Plastics Corporation filed this
action seeking indemnity from its excess insurer, Illinois
National Insurance Company, for a multi-million dollar
damage award Berry was ordered to pay to a disappointed

former customer. The insurance policy covers damages that Berry is required to pay "because of … Property Damage." R. 42-4 at 11. Berry had supplied defective laminate material to the customer, which incorporated that material into containers that subsequently failed. A jury ordered Berry to compensate the customer for the profits it could have expected to earn on future sales had the failure caused by Berry's defective material not caused buyers to turn away from the containers. Berry contends that it has been held liable for its customer's lost profits because of the property damage its defective component caused to the customer's containers. Although we agree with Berry that some portion of the lost profits theoretically might be attributable to property damage, Berry has neither undertaken to make that showing nor demanded the opportunity to do so. For that reason we affirm the district court's entry of summary judgment in favor of Illinois National.

## I.

Berry is a global manufacturer of (primarily plastic) packaging products with headquarters in Evansville, Indiana. Berry produced a foil laminate product for Packgen, a small firm that manufactures specialized containers for bulk quantities of industrial chemicals, manufacturing byproducts, and other materials. Over a period of two years, Packgen worked with one of its customers, CRI Catalyst Company, to develop a new type of intermediate bulk container ("IBC")[1] that could be used to store and ship a chemical catalyst that CRI produced

---

[1]   Packgen has given its IBCs the trade name "Cougars."

for use in the refining of crude oil into other petroleum products. This IBC was innovative in that its outer surface was comprised primarily of a polypropylene fabric rather than metal, allowing the container to be collapsed for pre-use storage and saving users space, several hundred pounds of weight, and money. The catalyst that CRI produces is a self-heating material that can ignite when exposed to oxygen, so it poses hazards that require special care in handling. To enhance the protective characteristics of the IBC's outer surface, Packgen engaged Berry to manufacture a laminated product comprised of a woven polypropylene chemically bonded to a layer of aluminum foil; the foil would strengthen the IBC's exterior and serve as a barrier to oxygen, ultraviolet light, and infrared radiation. After extensive testing of the final product, Packgen began to manufacture and ship the IBCs to CRI in October 2007. By April 2008, Packgen was selling an average of 1,261 IBCs per month to CRI. Packgen anticipated that it would continue to sell IBCs to CRI in comparable numbers for the foreseeable future. Packgen was also making overtures to 37 petroleum refiners in North America with ties to CRI; these refiners had expressed interest in the IBCs for use in disposing of spent catalyst.

In April 2008, while CRI personnel were lifting an IBC full of catalyst in order to re-position it on a pallet, the foil layer of the container's exterior surface separated from the polypropylene, causing the outer portion of the container to come apart and expose the interior lining. Several other failures of the foil laminate followed in short order, some resulting in fires when the catalyst within the containers was exposed to air. Packgen was notified of the failures and determined through its own

testing that the large roll of foil laminate that Berry had
delivered to Packgen in January 2008, and which Packgen had
used to produce some 2,000 IBCs since that time, was defective.
Although Packgen believed it could correct the problem either
by eliminating the foil laminate as a component of the contain-
ers or turning to another vendor for the foil laminate, the
damage had already been done: CRI canceled all pending
orders for the IBCs, destroyed the IBCs that Packgen had
already shipped to it, and refused to pay Packgen for those
containers. Word of the product's failure reached the oil
refineries that had expressed interest in purchasing IBCs, and
they made no purchases from Packgen.

Packgen sued Berry in Maine (where the suit was removed
from state to federal court) on theories of breach of contract,
breach of express warranty, breach of implied warranty for a
particular purpose, and breach of implied warranty of mer-
chantability,[2] all based on the failure of Berry's foil laminate
product. The jury found in Packgen's favor on each of these
claims, and pursuant to instructions which directed it to
compensate Packgen for the foreseeable losses (actual, inciden-
tal, and consequential) stemming from Berry's breaches of
contract and warranties (R. 55-4 at 10–11, 13–15) awarded
Packgen the full $7.2 million that it had sought in damages.
The jury did not itemize its damage award, but the award was
obviously based on the testimony of Mark Filler, Packgen's
expert on damages, who put the company's out-of-pocket costs
(including unpaid invoices for IBCs that had already been

---

[2]  A negligence claim was dropped before trial.

shipped to CRI[3]) at $643,039.30, and its future lost profits at $6,563,607.00 (producing the total of approximately $7.2 million). To arrive at the latter figure, Filler assumed that, had the foil laminate not caused the IBCs to fail, CRI would have continued to sell the containers to CRI at the April 2008 level for the full 10-year expanse of his projections, yielding profits to Packgen of $4,606,405.00. Filler also assumed that Packgen would have made more modest sales of the IBCs to some petroleum refiners over the same 10-year period, yielding profits of $1,957,202.00. The Court of Appeals for the First Circuit subsequently affirmed the judgment in favor of Packgen. *Packgen v. Berry Plastics Corp.*, 847 F.3d 80 (1st Cir. 2017).

Berry demanded that Illinois National indemnify it for all but the first $1 million of the award—which Berry's primary liability insurer, Federal Insurance Company, has agreed to cover—but Illinois National refused, prompting Berry to file suit. The $25 million liability policy issued to Berry obliged Illinois National to "pay on behalf of [Berry] those sums in excess of the Retained Limit [*i.e.*, the $1 million covered by the Federal policy] that [Berry] becomes legally obligated to pay as damages by reason of liability imposed by law because of … Property Damage … to which this Insurance applies … ." R. 42-4 at 11. The policy in turn defines "property damage" to include both "physical injury to tangible property, including all resulting loss of use of that property" and "loss of use of

---

[3]  Packgen would have earned profits of $130,629.93 on these invoices.

tangible property that is not physically injured." R. 42-4 at 33.[4] Illinois National took the position that because the entirety of the $6.2 million for which Berry was seeking indemnification from Illinois National represented Packgen's lost profits on IBCs that had yet to be ordered and manufactured, there was no property damage for which it had the duty under the policy to indemnify Berry. Berry, on the other hand, contended that the entirety of the damages it had been ordered to pay Packgen, including future lost profits, were "because of" the property damage Berry's defective foil laminate product had caused to Packgen's failed IBCs. Berry sought a declaration of Illinois National's obligation to indemnify it; it also asserted claims for breach of contract and bad faith based on Illinois National's refusal to do so.

On the parties' cross-motions for summary judgment, the district court entered judgment in favor of Illinois National. *Berry Plastics Corp. v. Ill. Nat'l Ins. Co.*, 244 F. Supp. 3d 839 (S.D. Ind. 2017). The court in the first instance rejected Berry's contention that collateral estoppel barred Illinois National, which had declined to participate in Berry's defense at the *Packgen* trial, from re-litigating the nature and extent of the damages resulting from the failure of Berry's product. The court noted, *inter alia*, that the jury in the *Packgen* suit had not been called upon to determine whether and to what extent Packgen's future lost profits were "because of" property

---

[4] The policy excludes any damage to Berry's own work and product (R. 42-4 at 16, 34), but it is undisputed that the injury Berry's defective laminate caused to Packgen's containers constitutes "property damage" within the meaning of the policy.

damage, which is the question determinative of Illinois National's duty to indemnify Berry. *Id.* at 846–47.

As to that issue, there was no Indiana case law on point, and so the court was required to predict how the Indiana Supreme Court would resolve the question. Upon surveying the case law from other jurisdictions, the district court concluded that "damages for lost profits are not covered as 'damages because of … Property Damage' unless they are a measure of the actual physical injury to tangible property or for the loss of use of that property." *Id.* at 849. The profits that Packgen lost on future sales of its IBCs did not constitute such a measure of physical injury or loss of property. Accordingly, the court was convinced that the Indiana Supreme Court would conclude that Illinois National had no duty to indemnify Berry for those lost profits. *Id.* at 849–50. The court went on to reject Berry's contention that the policy language was ambiguous in this respect and as such should be construed in its favor. "[T]he court finds the language of the Policy to unambiguously provide for damages arising from the physical damage to tangible property. Lost future profits arising from sales not yet made are not causally related to physical property damage." *Id.* at 850. Given that conclusion, the court also determined that Illinois National had not breached a contractual obligation to indemnify Berry. *Id.* at 851.

Finally, as to the bad faith claim, the court concluded that because Illinois National was correct in its assessment that it had no duty to indemnify Berry for Packgen's lost profits on future sales, the insurance company had been within its rights to decline to participate in (*i.e.* contribute money to) pre-trial

settlement negotiations; there was otherwise no evidence of "ill motive" on the part of Illinois National. *Id.* at 852.

## II.

Berry contends that the district court erred in construing the language of the Illinois National insurance policy to exclude coverage for lost future profits. Looking to a line of case law that attributes a broad causal meaning to "because of" and treats all consequential damages resulting from property damage to be liability incurred because of property damage, Berry argues that Packgen's lost profits on future sales of its IBCs necessarily are because of the damage Berry's defective foil caused to the completed IBCs sold to CRI. Berry therefore insists that the policy requires Illinois National to indemnify it for the entirety of the judgment against it over and above the $1 million covered by Federal. Berry also argues briefly that the district court was premature in granting summary judgment to Illinois National on the bad faith claim, as the parties had not yet completed discovery that, in Berry's view, was relevant to that claim.

## A.

Indiana law guides our analysis of Berry's claims in this diversity suit. Indiana courts construe the terms of insurance policies employing the same rules they apply to other contracts. *E.g.*, *Erie Indem. Co. v. Estate of Harris by Harris*, 99 N.E.3d 625, 630 (Ind. 2018). The language is interpreted from the perspective of an ordinary policyholder of average intelligence. *E.g.*, *Bradshaw v. Chandler*, 916 N.E.2d 163, 166 (Ind. 2009). If

reasonably intelligent persons could differ as to the meaning of a policy term, then it will be deemed ambiguous, *id.*, and construed against the insurer, *Wagner v. Yates*, 912 N.E.2d 805, 811 (Ind. 2009). If, on the other hand, the terms are clear, a court will give them their plain and ordinary meaning. *Id.* at 810–11.

An insured has the burden of demonstrating that its claim is covered under the policy terms, whereas the insurer has the burden of showing that an otherwise-covered claim is barred by an exclusion in the policy. *Telamon Corp. v. Charter Oak Fire Ins. Co.*, 850 F.3d 866, 869 (7th Cir. 2017) (Indiana law) (collecting cases). By the terms of its policy, Illinois National agreed to indemnify Berry for damages it is required to pay "because of" property damage. There is no dispute that property damage occurred: when Berry's laminate product failed, a number of IBCs came apart and any other IBCs assembled with the same defective laminate were rendered useless. 244 F. Supp. 3d at 845. Berry thus bears the burden of showing that Packgen's lost profits—for which the jury required Berry to reimburse Packgen—occurred "because of" that property damage. The Indiana Supreme Court has not yet decided under what circumstances, if any, future lost profits may be said to have occurred "because of" property damage caused by a manufacturer's defective product, for purposes of liability coverage. Our role, then, is to decide that question in the manner that we predict the Indiana Supreme Court would do so. *E.g.*, *Sutula-Johnson v. Office Depot, Inc.*, 893 F.3d 967, 971 (7th Cir. 2018).

**B.**

To make an obvious point first, lost profits are a form of business loss and as such are not the type of injury that the ordinary commercial general liability policy insures against. What an insurer like Illinois National undertakes to insure against in such a policy is property damage or bodily injury that results from the manufacturer's product after it leaves the manufacturer's hands, which represents a distinctly different form of risk from the disappointed commercial expectations of the manufacturer's customer. *See T.R. Bulger, Inc. v. Ind. Ins. Co.*, 901 N.E.2d 1110, 1115 (Ind. App. 2009); *Weedo v. Stone-E-Brick, Inc.*, 405 A.2d 788, 791-92 (N.J. 1979). A manufacturer's liability insurer is not insuring against the risk that a particular product may not perform as promised or may not meet the commercial expectations of the manufacturer's customers. Especially when a manufacturer has designed a product to meet the particular needs of one customer, the specifications the manufacturer has undertaken to meet, and the purposes its product are intended to serve, are matters of negotiation between the manufacturer and its customer; and the manufacturer's liability insurer stands at a remove from that relationship. *See Wausau Underwriters Ins. v. United Plastics Grp., Inc.*, 512 F.3d 953, 957–58 (7th Cir. 2008) (Illinois law) (citing *Robins Dry Dock & Repair Co. v. Flint*, 275 U.S. 303, 308–10, 48 S. Ct. 134, 135–36 (1927) (Holmes, J.)); *T.R. Bulger*, 901 N.E.2d at 1115; Roger C. Henderson, *Insurance Protection for Products Liability & Completed Operations—What Every Lawyer Should Know*, 50 NEB. L. REV. 415, 441 (1971). An insurance policy intended to backstop a manufacturer's warranties and contractual agreements would look quite different from a commercial general

liability policy. *See Am. Home Assur. Co. v. Libbey-Owens Ford Co.*, 786 F.2d 22, 27–28 (1st Cir. 1986). To the extent such undertakings are insurable at all, *see Wilder Corp. of Del. v. Thompson Drainage & Levee Dist.*, 658 F.3d 802, 805 (7th Cir. 2011) ("[o]ne generally can't insure against a breach of contract, because of moral hazard (the tendency of an insured to be less careful about preventing the harm insured against than if it were not insured)"), one might expect to see temporal limits on the insurer's liability for business losses resulting from product failures, not to mention the types of warranties or agreements (and whose commercial expectations) that are covered.[5] Those sorts of terms are obviously missing from the standard commercial general liability policy, which speaks in terms of property damage and bodily injury. Indeed, we note that Illinois National's policy expressly excludes from the scope of covered property damage "Property Damage to Your Product arising out of it or any part of it" and defines "Your Product" to include products manufactured or sold by Berry, as well as "warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of Your Product." R. 42-4 at 16, 33–34. Those are classic business risk exclusions that would appear to exclude losses for which Berry is deemed liable because its product has not functioned as Berry assured its customer that it would perform. *See generally* 1 Peter J. Kalis, et al., POLICYHOLDERS' GUIDE TO THE LAW OF INSURANCE COVERAGE (Walters Kluwer), § 10.02 (updated through 2018). Thus, a customer's business losses, if they are

---

[5] It strikes us as quite unlikely that warranties on a new product lacking a history of success in the field would be insured at all.

recoverable at all under the manufacturer's liability policy, may be recovered only if they occur as a consequence of the property damage that the policy expressly covers. *See Wausau*, 512 F.3d at 956–57.

This principle has a familiar parallel in tort law, which in the ordinary case deems economic losses flowing from torts such as negligence to be unrecoverable, because the tortfeasor cannot be charged with notice of the consequences his tortious acts might have on his victim's commercial arrangements and expectations. *JMB Mfg., Inc. v. Child Craft, LLC*, 799 F.3d 780, 785 (7th Cir. 2015) (Indiana law); *Wausau*, 512 F.3d at 957–58; *see also Indianapolis-Marion Cnty. Pub. Library v. Charlier Clark & Linard, P.C.*, 929 N.E.2d 722, 729–30 (Ind. 2010); *Gunkel v. Renovations, Inc.*, 822 N.E.2d 150, 152–56 (Ind. 2005); *Progressive Ins. Co. v. Gen. Motors Corp.*, 749 N.E.2d 484, 487–90 (Ind. 2001); *Reed v. Cent. Soya Co.*, 621 N.E.2d 1069, 1074–75 (Ind. 1993), *modified in other respects on reh'g*, 644 N.E.2d 84 (1994). A disappointed customer instead must resort to a claim for breach of warranty or breach of contract to recover for injuries to his goodwill or profit expectations—just as Packgen did in this case. *See Gunkel*, 822 N.E.2d at 153; *Progressive*, 749 N.E.2d at 489; *Reed*, 621 N.E.2d at 1075; *Thalheimer v. Halum*, 973 N.E.2d 1145, 1151–52 (Ind. App. 2012). The exception to this rule is when the economic losses occur in conjunction with property damage or bodily injury. *Wausau*, 512 F.3d at 956–57; *Reed*, 621 N.E.2d at 1075.

That said, we have in mind the central lesson of the Indiana Supreme Court's decision in *Sheehan Const. Co. v. Cont'l Cas. Co.*, 935 N.E.2d 160, *adhered to in relevant part as modified on reh'g*, 938 N.E.2d 685 (Ind. 2010), which is that coverage under

a commercial general liability policy depends on the terms of the policy rather than any distinctions that legal theory draws between business risk on the one hand and property damage on the other. The court in *Sheehan* looked to specific policy terms in deciding that the costs of repairing and replacing the damage caused by faulty construction work completed by the insured's subcontractor potentially were covered by the policy at issue, notwithstanding a judicial tradition of characterizing such costs as a business risk beyond the scope of a typical liability policy. *See id.* at 167–72; *see also Ind. Ins. Co. v. Kopetsky*, 11 N.E.3d 508, 521 ("the *Sheehan* court soundly rejected the notion of a general 'economic loss' doctrine in the CGL context"), *op. corrected in other respects, clarified & reaff'd on reh'g*, 14 N.E.3d 850, 853 (Ind. App. 2014), *transfer vacated*, 28 N.E.3d 245 (Ind. 2015). *Sheehan* did not address the possibility that future lost profits might be covered by such a policy, but the court's emphasis on what the policy terms cover, as opposed to what judicial and public policy doctrines suggest should or should not be covered, informs our own analysis of what losses the Illinois National policy might reach.

## C.

This brings us to the question whether the damages Berry was ordered to pay for Packgen's lost profits on prospective sales of its IBCs constitute damages imposed "because of property damage." Berry contends "because of" should be taken to connote the same sort of causal, "but for" meaning it carries in tort law, so as to include all damages that occur as a foreseeable consequence of the injury to property. Giving it that reading, Berry reasons that because its defective foil laminate failed in such a way as to cause property dam-

age—the IBCs came apart when CRI put them into use—the lost profits awarded by the jury in Packgen's breach of contract suit all occurred "because of" property damage and are therefore recoverable under the policy. Illinois National, on the other hand, argues that "because of" should be read more narrowly in view of the presumption against recovery of purely economic losses. It, like the district court, reasons that any category of damages is compensable under the policy only to the extent it constitutes a measure of the property damage caused by the defective product. On this view, the profits lost on the canceled invoices to CRI for IBCs which had already been manufactured (and were useless because they incorporated Berry's defective foil laminate) would constitute damages incurred because of property damage, but the profits lost on *anticipated* sales of containers that had not yet been manufactured (and not yet ordered) would not. In our view, the correct answer (and the one we believe the Indiana Supreme Court likely would adopt) lies somewhere between these positions and depends on a fact-sensitive inquiry with which Berry has not engaged. *See Wausau*, 512 F.3d at 959.

The district court relied on a series of cases reflecting the more restrictive understanding advocated by Illinois National as to what types of damages may be attributed to property damage. The approach is exemplified by our decision in *Travelers Ins. Cos. v. Penda Corp.*, 974 F.2d 823, 829–30 (7th Cir. 1992). In that case Penda, the insured, had manufactured defective polystyrene sheets that its customer, U.S. Sample, incorporated into sample books that, in turn, it had sold to its own customer. The styrene yellowed, rendering the assembled books useless and forcing U.S. Sample to replace them. Penda

was sued by U.S. Sample for breach of contract and warranty, seeking recompense not only for the profits lost on the assembled (defective) books, but the profits lost on future sales of sample books it would have made but for the mishap with Penda's defective polystyrene, and additionally damage to its reputation. Penda tendered defense of the suit to its liability insurer, Travelers, which took the position that the suit did not allege any form of covered property damage and that consequently it had no obligation to defend its insured. We disagreed, in part. We concluded that the allegations of lost profits on the assembled sample books themselves potentially did fall within the coverage of the policy: Penda's defective product had rendered those sample books useless and to that extent had caused property damage. The profits U.S. Sample had lost on those books thus could be characterized as a consequence of that property damage. *Id.* at 829. By contrast, "[w]e ha[d] little difficulty in concluding that U.S. Sample's broad allegations of future profit and reputational damage are purely economic losses and beyond the coverage of the policy." *Id.*

In a like vein, the district court in *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Ready Pac Foods, Inc.*, 782 F. Supp. 2d 1047 (C.D. Cal. 2011), applying California law, concluded that a lost patronage claim was not covered under an insured's commercial and excess liability policies. Ready Pac, the insured, produced pre-shredded and pre-washed lettuce for Taco Bell restaurants; and contamination of that lettuce caused foodborne illnesses among Taco Bell customers in the northeastern United States. Some 500 Taco Bell franchisees from around the country filed suit against Ready Pac for a nationwide drop-off

in patronage after the outbreak. There was no dispute that Ready Pac's contaminated lettuce had caused property damage to the extent it tainted the meal items into which it was incorporated as well as restaurant surfaces and equipment. *See id.* at 1050 & n.1, 1056. In Taco Bell's view, that property damage was a but-for cause of the lost profits to its franchisees, such that Ready Pac's commercial and excess liability carriers were obliged to cover those losses. The court was not convinced on that point:

> Taco Bell's claim for lost profits is not a measure of the damage to meals served at Taco Bell restaurants nor the cost of the destroyed contaminated food items. Taco Bell's alleged lost profits as a result of customers deciding not to eat at Taco Bell restaurants nationwide is not a measure of the value of the meals and goods that were destroyed at Taco Bell restaurants not affected by the Outbreak. Furthermore, Taco Bell's claim for lost profits from the decline in patronage is also not a measure of the costs incurred to clean up the Taco Bell restaurants affected by the Outbreak.

*Id.* at 1055. Accordingly, the court concluded that the claim "for lost profits at the Taco Bell restaurants that were never shutdown during the E. coli investigation [i]s a claim for purely economic loss, and not a measure of property damage or personal injury suffered by Taco Bell and its customers." *Id.* Given what it saw as the strength of California law limiting the recovery of consequential damages to losses constituting the measure of damage to tangible property (and the remediation

thereof), the court rejected as "unpersuasive" Taco Bell's reliance on the broader standard articulated in cases such as our own decision in *Wausau*, which we discuss momentarily. *Id.* at 1056 n.4.

Other courts have employed substantially similar reasoning in rejecting coverage for intangible economic losses. *See St. Paul Fire & Marine Ins. Co. v. Amsoil, Inc.*, 51 F. App'x 602, 605 (8th Cir. 2002) (unpublished) (2–1 decision) (Wisconsin law) (lost profits and market share resulting from damage insured's synthetic oil caused to customer's gear boxes "are economic losses and business risks not insured under [insured's] CGL policies"); *Essex Ins. Co. v. Chem. Formula LLP*, 2006 WL 5720284, at * 5–*6 (M.D. Pa. April 7, 2006) (injuries to commercial reputation and goodwill of janitorial cleaning supply firm after distributing insured's defective floor care product to customers whose floors were damaged were not losses because of property damage; reading liability policy to reach such intangible losses because they flowed from physical damage to property would "thwart the reasonable expectations of the parties" and "open[ ] the door too wide to be considered reasonable"); *Geddes & Smith, Inc. v. St. Paul-Mercury Indemn. Co.*, 51 Cal.2d 558, 566 (1959) (Traynor, J.) (allowing recovery for damage insured's defective doors caused to houses but disallowing homebuilder's lost profits and goodwill because "such damages …. are not commonly thought of as injuries to or destruction of property within the meaning of a public liability insurance policy").

These cases represent a narrow understanding of the losses that can be said to occur "because of" property damage to the extent they exclude any anticipated losses on products not yet

sold and produced. To be sure, there is a certain logic to this line of cases. Damaged or impaired property usually can be replaced; so in the ordinary case, the intangible consequences of an injury to property will be limited, in contrast to bodily injuries, which may have more long-lasting consequences. *See Westric Battery Co. v. Std. Elec. Co.*, 482 F.2d 1307, 1317 (10th Cir. 1973) (Colorado law). Once the assessment of consequential losses extends beyond the profits lost on existing goods and sales already made to an estimate of the profits lost on future anticipated sales, it is arguably enforcing the commercial expectations of the injured party more so than remediating property damage. On the other hand, the policy language itself draws no such distinctions explicitly. The policy indicates that any damages the insured must pay "because of" property damage are covered. The Indiana Supreme Court's *Sheehan* decision reminds us to focus on the meaning of such policy terms as opposed to the rationale of the economic loss doctrine. 935 N.E.2d at 169.

An ordinary understanding of the phrase "because of" would include a broad array of consequential damages, not simply those that constitute a measure of the injury to the property itself. *See Cincinnati Ins. Co. v. H.D. Smith, LLC*, 829 F.3d 771, 774 (7th Cir. 2016) (liability policy covering damages "because of" bodily injury provides broader coverage than policy that only covers damages "for" bodily injury). And to the extent that a causal connection can be shown between property damage and lost profits, nothing in the term "because of property damage" suggests that such lost profits necessarily should be excluded. If the delamination of Berry's defective product and the disintegration of a Packgen IBC had resulted

in a fire that shut down CRI's catalyst-manufacturing facility for a substantial period of time, for example, why should the profits and market share lost to CRI as a result of this incident not be considered a measure of the injury to CRI's property, in the sense that it addresses the entirety of a loss CRI would not have suffered but for the concrete property damage that occurred?

Given that there is no language in Illinois National's policy that on its face excludes any category of losses that are incurred "because of" property damage, we are willing to assume, consistent with Berry's argument, that the Indiana Supreme Court might well leave the door open to coverage of future losses, including lost profits and loss of goodwill, *so long as* the insured can establish a causal relationship between the property damage and those losses. We summarized this broader understanding of the "because of" language in *Wausau*: "As in tort law, so in liability-insurance law[:] once there is damage to property[,] the victim can recover the nonproperty, including business, losses resulting from that damage and not just the diminution in the value of the property." 512 F.3d at 956–57 (citations omitted). *See* 3 Allan D. Windt, INSURANCE CLAIMS AND DISPUTES, § 11.1 at 11–19 (6th ed. 2013) ("Liability policies cover not only damages *for* property damage, but damages *because of*, *on account of*, or *by reason of* property damage. Accordingly, once covered property damage exists, all consequential damages are covered.") (emphasis in original) (collecting cases); 1 Barry R. Ostrager & Thomas R. Newman, HANDBOOK ON INSURANCE COVERAGE DISPUTES, § 7.03[b][2][D] (2011) ("[T]he most sensible reading of the … phrase, 'damages because of … property damage,'

requires the insurer to pay all damages which are causally related to an item of 'property damage' which satisfies either of the policy's definitions.") (quoting *Federated Mut. Ins. Co. v. Concrete Units, Inc.*, 363 N.W.2d 751, 757 (Minn. 1985)); 12 COUCH ON INSURANCE 3D, § 172:32 at 172–76 through 172–77 (updated through 2018) ("absent an express provision excluding coverage for consequential damages, a liability policy insuring against all sums which insured became legally obligated to pay because of bodily injury or property damage includes a claim for loss of business and profits arising from property damage") (citing *Great Am. Ins. Co. v. Lerman Motors, Inc.*, 491 A.2d 729 (N.J. App. Div. 1984)); Laurie Vasichek, Note, *Liability Coverage for "Damages Because of Property Damage" Under the Comprehensive General Liability Policy*, 68 Minn. L. Rev. 795, 818 (1984) ("[t]his reading of the phrase 'because of' limits coverage of consequential and tangible losses to situations where the insured can show a causal connection linking the losses to covered property damage and, concurrently, renders coverage highly elastic, with its scope adjusting to the causal connection with the 'property damage' and other injuries"); *Am. Home Assur. Co. v. Libbey-Owens Ford Co.*, *supra*, 786 F.2d at 26 ("the term 'because of property damage' can reasonably be interpreted to mean all liability arising from such damage"); *see also*, *e.g.*, *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Puget Plastics Corp.*, 532 F.3d 398, 403 (5th Cir. 2008) (Texas law) (excess liability policy covers consequential damages, including lost profits and diminution in value of company, which were result of property damage); *Ferrell v. West Bend Mut. Ins. Co.*, 393 F.3d 786, 795 (8th Cir. 2005) (Wisconsin law) ("That the damages at trial [for breach of

warranty] were measured in terms of lost profits or diminished gross receipts does not change the fact that property was damaged. The measure of damages is distinct from the question whether there was 'property damage' under the policy."); *Aetna Cas. & Sur. Co. v. Gen. Time Corp.*, 704 F.2d 80, 83–84 (2d Cir. 1983) (New York law) (lost profits resulting from physical injury insured's motors caused to customer's zone valves were among the consequential damages covered by liability policy); *Todd Shipyards Corp. v. Turbine Serv., Inc.*, 674 F.2d 401, 418, 423 (5th Cir. 1982) (La. law) (loss of use of ship due to damage inflicted by insured's faulty repair work to turbine covered), *called into doubt in other respects by Nathaniel Shipping, Inc. v. Gen. Elec. Co.*, 932 F.3d 366, 367–68 (5th Cir. 1991); *Cent. Armature Works, Inc. v. Am. Motorists Ins. Co.*, 520 F. Supp. 283, 289 (D. D.C. 1980) (lost profits stemming from loss of use of scrap metal shredder damaged by insured's negligent repair efforts covered); *Fitness Equip. Co. v. Pa. Gen. Ins. Co.*, 493 So.2d 1337, 1343 (Ala. 1985) (treadmill manufacturer's lost profits and lost contracts resulting from treadmill damage caused by  insured's faulty motors were damages "because of" property damage).

Our decision in *Wausau* illustrates the application of this broader rule. The insured in that case, United Plastics Group (UPG), had manufactured defective water heating chambers that were incorporated into tankless water heaters produced by another company, Microtherm. Roughly 600 of the UPG chambers ruptured, in some cases leaking onto the heater's control board and causing it to short out, in other instances causing water to leak out of the heater and damage the consumers' carpets and floors, and in a minority of cases simply

causing the heater not to work. Customer dissatisfaction
ensued, and sales of the Microtherm heaters suffered signifi-
cantly. Microtherm sued UPG, alleging that UPG had misrep-
resented the quality of its heating chambers. A Texas jury
agreed and awarded Microtherm $25 million in lost profits,
among other losses. UPG in turn sued its excess liability
insurer, Ohio Casualty, seeking indemnity on the ground that
the lost profits were due to property damage. The district court
held Ohio Casualty liable for the full amount, but we re-
manded for a trial to determine (a) the extent to which the 65
to 75 heater failures that occurred during the time period
during which the Ohio Casualty policy was in force contrib-
uted to Microtherm's lost profits; and (b) the extent to which
those lost profits were due to the property damage caused by
UPG's defective heating chambers, as opposed to their failure
to perform up to warranted specifications. We agreed that
property damage had occurred in at least some instances,
specifically when leaking water from the defective heating
chambers either shorted out heaters' circuit boards or spoiled
consumers' floors. But we also pointed out that the defective
heating chambers could cause the heaters to fail without
causing property damage in these ways: "only about 80
percent of the water-chamber ruptures shorted the circuit
board; the other 20 percent just caused the water heater to stop
working, and that we know is not property loss." *Id.* at 958.

> The deeper problem is that the business losses
> for which Microtherm sued might well have
> occurred even if no [heating chamber] had
> ruptured. From the consumer's standpoint, the
> precise mechanism that causes his hot-water

heater to stop working is irrelevant; all he cares about is that he has no hot water. No doubt if the broken heater leaks and ruins its owner's carpet, there is added fury against Microtherm; but we do not even know how many of the broken heaters caused such damage. The question how much of Microtherm's business losses were due to the rupture of some 52 to 60 failed water chambers that damaged a circuit board (80 percent of the 65 to 7[5] total failures) was not presented to the jury in Texas because it is an issue related only to insurance coverage, which was not the subject of the Texas case. But not all the business-loss damages awarded in that case could have been due to the 10 percent or fewer ruptures (52–60 out of 600) that both caused damage to property (either to the circuit board or the owner's other property, but as we do not know how many of the ruptures caused damage to the owners' other property we are stuck with our 52–60 estimate) and occurred during the coverage period. That incremental damage may have been less than 10 percent of the total damages. …

*Id.* at 958–59. We left it to the district court to sort out these questions on remand.

## D.

Assuming that Indiana law would permit the recovery of lost future profits, *Wausau* makes clear that whether the Illinois

National policy covers an award of such business losses depends on whether those losses were specifically due to property damage or instead to the failure of Berry's foil laminate product to function as expected and warranted. The verdict against Berry in the *Packgen* litigation does not answer this question, as the contract and warranty theories on which Packgen prevailed turned on the failure of Berry's product to satisfy agreed-upon or implied criteria rather than the occurrence and consequences of any property damage. Berry's briefs elide the distinction between the two possible causes of Packgen's losses,[6] but the distinction is critical to Berry's case for indemnification. Berry's own argument is that the "because of" language in the policy requires that Berry be indemnified for Packgen's business losses so long as they were caused by property damage. Certainly it is possible to imagine a set of facts in which this causal nexus could be established, but it is equally possible to imagine scenarios in which none or only a portion of Packgen's profits were due to property damage as opposed to the failure of Berry's product to function as warranted, just as we explained in *Wausau*.

To begin with the latter possibility: Imagine that CRI, when it received its very first shipment of IBCs from Packgen, had performed its own precautionary inspection and testing of one or more containers (not yet filled with catalyst) and discerned

---

[6] *See, e.g.,* Berry Br. 14 (treating damages caused by insured's failed product and damages caused by covered property damage as identical); Berry Reply Br. 30 (treating *Packgen* jury's findings as to damages resulting from "Berry's alleged failure to supply [a] compliant product" as dispositive of Illinois National's duty to indemnify Berry).

that the foil laminate was not up to the task for which it was designed. Perhaps CRI would only be able to reach this conclusion if the foil product actually delaminated and "damaged" the container by causing it to begin coming apart, just as we know it did come apart in multiple instances when CRI put the containers into use. But in the testing/inspection scenario we are hypothesizing, any actual property damage would necessarily be limited. What would matter, from CRI's perspective, is that the container (and, in particular, Berry's foil/polypropylene laminate) failed to perform as expected. Given the nature of CRI's business and the purposes for which it intended to use the IBCs—carrying a flammable material—the reliability of the containers would be of the utmost concern to CRI. Once inspection and testing revealed that the containers might fail, expose the catalyst, and thereby present the risk of fire or explosion, CRI might well decide to cancel its orders for the IBCs, just as it did after multiple failures occurred in practice. In our scenario, it would be easy to see why Packgen's ensuing commercial losses would be due largely, if not exclusively, to the failure of the product to perform as warranted rather than any limited property damage that occurred in testing. A jury might very well still hold Berry liable for breach of contract and warranty in that scenario, but Illinois National would not be required to indemnify Berry for an award of Packgen's lost profits, as those losses would not be attributable to property damage.

On the other hand, it is possible to imagine scenarios in which Berry's component (and the IBCs into which it was incorporated) does not simply fail to perform, but fails in a disastrous way resulting in grievous injury to Packgen's

customer. We know from the *Packgen* trial record, for example, that some of the IBC failures resulted in fires when the catalyst within those containers was exposed to air. Suppose as we hypothesized earlier that such a fire spread and burned out of control, causing extensive damage to CRI's facility and existing stock of catalyst—all of that constituting "property damage" within the meaning of the Illinois National policy. (A similar fire occurring at a petroleum refinery upon receipt of an IBC containing fresh catalyst from CRI might produce even more devastating results.) CRI, naturally, would tell Packgen to drop dead in the wake of such a disaster. In such a scenario it would not be difficult to make the case that Packgen's lost future sales to CRI were due to the property damage that CRI experienced as opposed to the simple failure of product to perform as expected. And if the fire and damage achieved notoriety within the petroleum refining industry, one might say the same as to lost sales to other prospective customers.

But Berry has made no effort, below or on appeal, to make such a case. Its primary contention in that regard is that collateral estoppel, or issue preclusion, bars Illinois National from attempting to contest the proposition that the losses awarded in the *Packgen* suit were "because of" property damage.[7] That contention is a non-starter, because the *Packgen*

---

[7] Below, in opposing Illinois National's motion for summary judgment, and in support of its own cross-motion for summary judgment, Berry asserted that the underlying *Packgen* litigation had already resolved the question whether the losses for which Berry was ordered to compensate Packgen were "because of" property damage and that Illinois National was thus barred from re-litigating that question in this suit. *See* R. 55 at 22.

jury was not presented with the questions that are dispositive of Illinois National's duty to indemnify Berry.

A fundamental prerequisite for treating a prior adjudication as conclusive in subsequent litigation is that the former necessarily resolved the same issue presented in the latter. *Earl v. State Farm Mut. Auto. Ins. Co.*, 91 N.E.3d 1066, 1074 n.5 (Ind. App. 2018) (quoting *Afolabi v. Atl. Mortg. & Inv. Corp.*, 849 N.E.2d 1170, 1175 (Ind. App. 2006)); *see, e.g., Frankenmuth Mut. Ins. Co. v. Williams by Stevens*, 690 N.E.2d 675, 678–79 (Ind. 1997) (where insured babysitter had consented to judgment on claim that her negligent supervision of child was cause of injuries child suffered when molested by babysitter's husband, insurer, having declined to defend insured in underlying action, was estopped from denying coverage on ground injuries to victim were result of intentional act; consent judgment embodied legal conclusion that injuries were result of insured's negligence).

The *Packgen* jury decided that Berry breached its agreement with Packgen as well as the implicit and explicit warranties it made to Packgen regarding its foil laminate and determined the losses that resulted from these breaches; the jury was not called upon to decide whether Berry's defective product resulted in property damage, let alone whether the losses that Packgen suffered were "because of" such damage. *See Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Puget Plastics Corp., supra*, 532 F.3d at 404 (jury in underlying action had no reason to consider whether damages constituted property damage within meaning of liability policy); *Wausau Underwriters Ins. Co. v. United Plastics Grp., Inc.*, 2010 WL 538544, at *3 (N.D. Ill. Feb. 10, 2010) (on remand from this court's decision in *Wausau*,

*supra*) ("While an underlying trial and verdict may certainly bear upon an insurer's duty to indemnify, issues exclusively relevant to coverage, as opposed to liability, are typically not litigated in an underlying case. As a result, courts may consider additional evidence when deciding later indemnification actions.") (citations omitted); *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Reichhold*, 2009 WL 3125483, at *5 (M.D.N.C. Sep. 30, 2009) ("while neither party may 'relitigate' issues that have been determined in the underlying cases, the Court concludes that the underlying cases did not resolve whether the damages were for 'property damage' and it will be for the jury in this present case to determine what proportion of Reichhold's liability in the underlying claims was because of 'property damage' under the terms of the policies").

Whether and to what extent Packgen's losses were due to property damage, as opposed to the failure of Berry's product to perform as promised, are the questions dispositive of Illinois National's duty to indemnify Berry, and our decision in *Wausau* leaves no doubt that these are issues which must be independently resolved here: *Wausau* expressly held that the incremental harm attributable to property damage "was a key issue that the district judge should have tried" in the indemnity action "rather than supposing it to have been resolved by the Texas jury" in the underlying liability action. 512 F.3d at 959.

Apart from its meritless invocation of issue preclusion, Berry has not outlined a case for the notion that some or all of the lost profits awarded by the *Packgen* jury were the result of property damage, nor has it asked for the opportunity to present such a case to the factfinder as our decision in *Wausau*

envisions. Berry implicitly presumes that because its product failed in such a way as to cause property damage (*i.e.*, the foil/polypropylene product delaminated and rendered the IBCs useless), *all* damages resulting from the failure of its component were necessarily "because" of property damage.

Equating the failure of its product to perform as expected (and warranted) with property damage is both wrong, for the reasons we have already discussed, and inconsistent with our reasoning in *Wausau*. For purposes of establishing its right to indemnity, Berry may well have a case to make for the notion that the property damage its product caused incrementally increased Packgen's losses. In contrast to the defective water-heating chamber at issue in *Wausau*, for example, Berry's foil laminate was an integral part of the IBC and it is difficult to imagine ways in which it could fail without damaging the overall container. *Cf. Konrad Marine, Inc. v. Marine Assocs., Inc.*, 831 N.W.2d 825 (table), 2013 WL 1580354, at *5 (Wis. Ct. App. April 16, 2013) (non-precedential decision) (declining to parse source of consequential lost profits) ("Here, there was physical injury to some or all of the stern drives when the teeth sheared off the gears. One can reasonably infer that the additional harm, above and beyond the gear failure, contributed to customers' perceptions regarding the stern drives."). But Berry does not endeavor to make such a case. We point out in this regard that the fires which accompanied some of the IBC failures lend additional plausibility to the notion that it may have been the property damage, and not the simple failure of Berry's foil laminate to perform as expected, that frightened CRI and petroleum refiners away from Packgen's containers; but Berry's briefs barely mention these incidents. As we have

said, Berry equates the failure of its product to perform with property damage, and presumes that all of the six-plus million dollars in lost profits the *Packgen* jury awarded for the former are damages "because of" the latter. That premise is incorrect, and because Berry's appeal is founded on that premise alone, it has waived any contention that we should, as in *Wausau*, remand for further proceedings.

There is another point to be made before we conclude with this subject. The *Packgen* jury award was based on the expert Filler's 10-year projection. Apparently Filler, in consultation with Packgen's president, estimated that it would take five years for the petroleum industry to forget about the failure of Packgen's IBCs and another five years beyond that for Packgen to attain the same level of IBC sales it was making in April 2008. Part of Berry's burden in establishing that the monetary damages the *Packgen* verdict required it to pay were "because of"property damage is to show that the full 10 years of projected losses were attributable to such damage. That task becomes more difficult the further one projects out from the April 2008 failure of Berry's product. It might be reasonable to attribute a shorter period of Packgen's business losses to the property damage inflicted by Berry's bad run of laminate. But to retroactively guarantee Packgen's profits for such a lengthy period of time—particularly for a new product without a record of reliable service and sales—looks much more like the policy is being used to insure the commercial expectations Packgen harbored based on Berry's representations and warranties as to how its laminate product would perform. Absent proof that the property damage itself was so egregious as to ruin Packgen's reputation in the industry, such a result

would be inconsistent with the scope, terms, and purpose of the policy.

These are the sorts of considerations that would have to be sorted out in a trial on the question of coverage. But as we have said, Berry has not asked for such a trial, nor has it laid out what case it would make at such a trial to warrant indemnity, in whole or in part, for the *Packgen* jury's award of lost profits.

**E.**

We need finally say only a relative few words about Berry's bad faith claim. The Indiana Supreme Court recognized in *Erie Ins. Co. v. Hickman*, 622 N.E.2d 515 (Ind. 1993), that an insurer may be held liable in tort for a failure to deal with its insured in good faith. Berry's claim that Illinois National breached its duty of good faith is premised on Illinois National's refusal to participate in (and pledge money toward) pre-trial discussions of a possible settlement of the *Packgen* suit, notwithstanding Federal's own tender of its $1 million policy limit toward such a settlement. That refusal, Berry contends, nixed the prospects for settlement and instead left Berry on the hook for the substantial award of damages later imposed by the *Packgen* jury. Berry adds that the district court's rejection of this claim was premature, as Berry had not yet had the opportunity to engage in discovery as to what Illinois National knew about the meaning of the policy's "because of" language and its (private) reasons for refusing to contribute funds toward a possible settlement of the *Packgen* litigation.

Like the district court, however, we are not convinced that Berry has a plausible claim of bad faith to pursue. From the start, Illinois National's position has been that Packgen's loss

of future business was not the sort of loss that could be attributed to property damage. Given precedents such as *Penda* and *Ready Pac*, and the unsettled nature of Indiana law on this point, this was not an objectively unreasonable position for Illinois National to take. Morever, even under the more liberal approach to commercial losses reflected in cases like *Wausau*, Berry would still have to demonstrate a causal link between any such losses and the property damage that its defective component caused.

The *Hickman* decision indicates that a genuine dispute as to whether an insured has a valid claim under the policy or as to the amount of such a claim will not establish breach of the insurer's duty of good faith; such a breach occurs when the insurer "denies liability knowing that there is no rational, principled basis for doing so." 622 N.E.2d at 520; *see also Freidline v. Shelby Ins. Co.*, 774 N.E.2d 37, 40 (Ind. 2002). Our decision here leaves open the possibility that the Indiana Supreme Court *might* treat an award of lost profits or injury to goodwill as compensable under a liability policy when those losses are indeed caused by property damage as opposed to the simple failure of the insured's product to perform as expected. Whether Berry could make that showing (and as to what portion of Packgen's losses) was never a foregone conclusion and even now remains open to reasonable debate given Berry's failure to make a case on this point. *See id.* at 42–43. Remanding for discovery, as Berry insists we should do in the hope that it might discover evidence that Illinois National privately believed something contrary to its public position as to its liability for lost profits, *cf. Monroe Guar. Ins. Co. v. Magwerks Corp.*, 829 N.E.2d 968, 976–77 (Ind. 2005)

(insurer had essentially acknowledged prior to insured's suit that roof collapse met criteria for coverage), would be a license for a pointless fishing expedition. The district court did not resolve this claim prematurely.

## III.

For all of the foregoing reasons, the district court properly entered summary judgment in favor of Illinois National.

AFFIRMED